IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALLEN CALTON, | § | |
| TDCJ #1123880, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2507 |
| | § | |
| BRAD LIVINGSTON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

State inmate Allen Calton (TDCJ #1123880) has filed a complaint under 42 U.S.C. § 1983, alleging violations of his civil rights in connection with the conditions of his confinement. Pending before the Court are motions for summary judgment by two groups of defendants [Docs. # 72, # 74]. Calton has filed a response to each motion [Docs. # 78, # 79]. After reviewing all of the pleadings, the exhibits, and the applicable law, the Court **grants** the defendants' motions and dismisses this case for reasons that follow.

## I.    BACKGROUND

Calton is presently incarcerated in the Texas Department of Criminal Justice ("TDCJ") at the Michael Unit in Tennessee Colony, Texas. His allegations, however, stem from an incident that occurred at the Byrd Unit, in Huntsville, where he attempted to commit suicide on September 19, 2008. Calton sues the following security or correctional officers in connection with that incident: Lieutenant Karl Krischke, Sergeant Beverly Cannalito; and Officer Carolyn O'Bryant. Calton also sues the following health care providers employed

by the University of Texas Medical Branch ("UTMB") at the Byrd Unit facility: Mental

Health Manager Samuel Hallman; Licensed Vocational Nurse Beverly Love; and Mental

Health Clinician Richard Tolles.[1]   The chronology of events that form the basis for Calton's

complaint, as well as the relevant policies that pertain to preventing suicide by offenders

assigned to TDCJ, are summarized below along with Calton's allegations in this case.

### A.      Chronology of Calton's Confinement in TDCJ

Calton was convicted of attempted murder and sentenced to life in prison following

a 2004 jury trial in the 213rd District Court of Tarrant County, Texas.[2]   Following that

conviction, Calton was assigned to TDCJ's Clements Unit.  In 2006, doctors determined that

Calton suffered from major depressive disorder and anti-social personality disorder.  Calton

was given a prescription for the anti-depressant Wellbutrin to treat his condition.  In addition

---

[1]      Calton has also sued Jamie Williams, who works as an administrator for UTMB at the Byrd
Unit.  Calton concedes that he has never met Williams, and that she was not present at the
Byrd Unit on the day of his suicide attempt. Calton does not allege, and the evidence does
not show, that Williams had any policymaking authority or supervisory responsibility over
the other defendants in this case.  Thus, Calton concedes that she had no personal
involvement with the incident that forms the basis of his claim that he was denied adequate
care on September 19, 2008, when he announced that he was suicidal.  Williams has moved
for summary judgment on the grounds that there is no evidence showing that she had any
personal involvement with the incident at issue and that she is otherwise entitled to qualified
immunity. [Doc. # 72].  Calton concedes that "[she] is entitled to summary judgment on her
qualified immunity defense." [Doc. # 78, at 12, n.6].  For this reason, the Court will grant
Ms. Williams' motion for summary judgment and will not address the claims directed toward
her any further.

[2]      *See Calton v. State*, 2-04-228-CR, 2005 WL 3082202 (Tex. App. — Fort Worth, Nov. 17,
2005, pet. withdrawn); *see also Calton v. Quarterman*, Civil Action No. 4:07-471, 2008 WL
5083022 (N.D. Tex. Sept. 16, 2008) (recommending that Calton's petition for a writ of
habeas corpus be denied).  Calton was convicted separately of evading arrest with a motor
vehicle.  *See Calton v. State*, 176 S.W.3d 231 (Tex. Crim. App. 2005).

to this medication, Calton was also taking Haldol, Cogentin, and Carbamazepine for an unspecified seizure disorder.[3]

In late July of 2008, Calton was transferred from TDCJ on a bench warrant to the Tarrant County Jail in Forth Worth, Texas.  Calton was reportedly returned to Tarrant County on a bench warrant for the purpose of appointing counsel to represent him in connection with an unspecified post-conviction proceeding. While he was in the Tarrant County Jail, Calton continued to receive all of his prescribed medications.  He was "disappointed" by the proceedings in Tarrant County, however, because he had hoped to get his conviction overturned.  When this did not occur, Calton reportedly felt "kind of bad."

On September 5, 2008, Calton left the Tarrant County Jail and returned to TDCJ custody at the Middleton Unit in Abilene, Texas.  Calton claims that, after his arrival at the Middleton Unit on September 5, through September 10, 2008, he did not receive any of his medication.  On September 10, 2008, a physician at the Middleton Unit examined Calton and prescribed Celexa, instead of Wellbutrin, to treat his depression.  Because the Middleton Unit did not have housing accommodations that suited Calton's custodial classification level, Calton was transferred to the Byrd Unit in Hunstville, Texas, for re-assignment.

Calton arrived at the Byrd Unit at around noon on September 18, 2008.  A Senior Warden for the Byrd Unit (Senior Warden Tracy Bailey) describes the unit as an "intake

---

[3]     Deposition of Allen F. Calton [Calton Dep.], at 60, 70.  Unless it is pertinent or otherwise attributed, most of the facts outlined in the chronology are taken from Calton's deposition, selected portions of which are found in Exhibit A to his response to the defendants' summary judgment motions. [Docs. # 78, # 79].

facility" with a relatively small (approximately 237 offenders) permanent inmate population.[4]

Warden Bailey explains that most of the inmates assigned to the Byrd Unit are in transit from

various other prison units to the nearby UTMB Hospital in Galveston or are "newly

convicted offenders who are in-processing [sic] to the TDCJ prison system." These

"transient offenders" are typically assigned to the Byrd Unit for a short time during the intake

process. Warden Bailey estimates that the average length of assignment for a transient

offender at the Byrd Unit is "about 45 days." According to Warden Bailey, the Byrd Unit

facility processes a high volume of inmates assigned to TDCJ. Warden Bailey notes that, in

2009, approximately 88,000 transient offenders passed through the Byrd Unit.

Calton arrived at the Byrd Unit on September 18, 2008, along with a bus full of other

prisoners.[5] Calton and the other prisoners reported directly to a large intake area where

"SSI" workers (*i.e.*, inmates assigned to provide support services or other labor) were

distributing state-issued clothing and other supplies under the supervision of correctional

officers. Calton was issued a uniform, "boxers," and a "bedroll," which contained sheets,

a blanket, toilet paper, soap, and a plastic safety razor for shaving.

Prisoners assigned to state prison receive a razor because TDCJ has a grooming policy

---

[4]  Doc. # 75, Exhibit B, Expert Report from Tracy Bailey, Senior Warden at the Byrd Unit ["Bailey Report"], at ¶ 5.

[5]  Calton Dep. at 74. Calton estimates that there were approximately 45 other prisoners on his bus, and that other buses were arriving throughout the day. *Id.* at 74-75 ("[B]uses come in all day every day" at the Byrd Unit. . . . "It's an all-day thing on those intake units.").

that requires inmates to be clean-shaven, subject to certain exceptions, for security reasons.[6]
Evidence in the record reflects that incoming inmates at the Byrd Unit are given a plastic
disposable razor with their bedroll.[7]  Thereafter, inmates are given a new razor on a weekly
basis.[8]  Inmates who are assigned to "administrative segregation or special housing,"
however, are not given a razor.[9]  These inmates are given a razor "when they go to shower,
but then they've got to hand it back."[10]  Warden Tracy Bailey adds that inmates who are
identified by medical staff as a suicide risk are not issued a razor, but are instead given a
"clipper shave," which is a "device [that] cannot be used to harm oneself."[11]

### B.      Screening Procedures for Transient Offenders

During the intake process, incoming inmates are strip-searched and their property is
screened for contraband.  Inmates are also subject to certain screening procedures designed
to facilitate appropriate classification and custodial assignment.  All incoming offenders are

---

[6]      The grooming policy, which prohibits long hair and beards of more than one-quarter inch,
has been addressed at length (no pun intended) in other cases.  *See, e.g., DeMoss v. Crain*,
636 F.3d 145, 153-55 (5th Cir. 2011); *Longoria v. Dretke*, 507 F.3d 898, 901-02 (5th Cir.
2007); *Diaz v. Collins*, 114 F.3d 69, 72-73 (5th Cir. 1997).

[7]      Deposition of Beverly Cannalito [Cannalito Dep.] at 43.

[8]      *Id.*

[9]      *Id.*

[10]      *Id.*

[11]      Bailey Report, at ¶ 5.

5

screened for physical, medical, mental, and dental issues.[12]  Once the screening process is completed, the classification department determines an appropriate unit for long-term assignment and these inmates are transferred elsewhere to other TDCJ facilities throughout the state.

Mental health screening is included in the intake process.  TDCJ has a written policy, which contains a detailed list of "behaviors suggestive of suicidal intent" along with procedures for handling offenders who have been identified as suicide risks.[13]  Under this policy, TDCJ Administrative Directive 06.56 ("AD-06.56"), "[o]ffenders are considered to be suicide risks when behavior appears to have the intent or the definite potential of leading to self-inflicted physical harm or death."  This policy requires that, when offenders are received at intake facilities, such as the Byrd Unit, "a trained intake screener shall administer a Diagnostic Screening Interview."  This policy requires further that any inmate who expresses "suicidal ideas or self-injurious thoughts or behaviors" during the Diagnostic Screening Interview process "shall be referred to the unit medical department," which is then "responsible for ensuring appropriate medical management of the offender identified as potentially suicidal."

When Calton arrived at the Byrd Unit on September 18, 2008, he was screened by an "intake nurse," who asked whether he had any acute medical problems or conditions that

---

[12]     Deposition of Samuel Hallman [Hallman Dep.] at 113.

[13]     Doc. # 75, Exhibit H, TDCJ Administrative Directive 06.56 [AD-06.56] (Rev. 5) April 25, 2007.

required medication.  Calton recalls that the intake nurse specifically asked him whether he was suicidal.  Calton told her that he was "feeling pretty depressed" and that he needed medication, but he denied feeling suicidal.  Noting that Calton also had a "seizure disorder" that required medication, the nurse issued him a pass to "see somebody" in the psychiatric department.

Within two hours of his arrival at the Byrd Unit on September 18, 2008, Calton was evaluated by Richard Tolles, who is employed by UTMB as a "Mental Health Clinician" or "counselor" at the intake facility.  By Calton's own estimation, he visited with Tolles for at least an hour.  During this interview, Calton reportedly disclosed to Tolles that he had previously attempted suicide in 2005, by cutting his wrist with a razor.  Tolles followed up by asking Calton "a lot of questions."  Medical records indicate that Tolles, who noted a "superficial scar" on Calton's wrist, conducted a mental health evaluation, which included a suicide risk assessment.[14]  The records from this evaluation reflect that Tolles could not access the Electronic Medical Record (EMR) system on that date because of lingering damage to the area from Hurricane Ike.[15]  Calton told Tolles that he was currently receiving

---

[14]     Doc. # 73, Ex. A, Medical Records, at 10-16.

[15]     *Id.*  The Court takes judicial notice that Hurricane Ike made landfall in Galveston, Texas, on September 13, 2008, and caused extensive damage.  Much of Galveston flooded, including the UTMB Hospital, which closed for an extended period of time.  The federal courthouse in Houston was also closed for most of the following week, through Friday, September 19, 2008, due to widespread power outages caused by Hurricane Ike.

Celexa to treat his depression, but that this medication did not "help" him.[16]  Calton told

Tolles that he needed Wellbutrin because this medication was the only thing that helped.[17]

In addition to making observations about Calton's demeanor, Tolles noted that Calton

expressly denied feeling suicidal or having "any current thoughts of self-harm."[18]  Based on

his evaluation, Tolles determined that Calton was not suicidal or in need of a transfer for

"crisis management" at an in-patient care facility, but referred him to the unit psychiatrist for

further treatment at the next available appointment.[19]

Calton did not tell Tolles, the intake nurse, or anyone else he saw during the intake

process on September 18, 2008 that he was suicidal.[20]  Calton explains that he did not advise

anyone that he was suicidal when he first arrived at the Byrd Unit on September 18, 2008,

because he was not feeling suicidal on that date.  According to Calton, he did not begin to

feel suicidal at the Byrd Unit until the morning of September 19, 2008, when he awoke

feeling "very depressed."[21]

## C.    Events Leading Up to Calton's Suicide Attempt

At around 8:30 a.m. on the morning of September 19, 2008, Calton summoned an

---

[16]    Doc. # 73, Ex. A, Medical Records, at 10.

[17]    *Id.*

[18]    *Id.* at 11.

[19]    *Id.*

[20]    Calton Dep. at 75-76, 79-80.

[21]    Doc. # 52, at ¶ 23.

unidentified correctional officer, who was conducting the morning count of Calton's housing unit, and told this officer that he was suicidal.[22]  Specifically, Calton told the officer that he "wanted to die," that he "was going to kill [him]self," and that he needed help.  Calton acknowledges that the officer "immediately" stopped what he was doing and escorted him to the ranking officer on duty (Lieutenant Krischke), whose desk was located in the main hallway.  At Lieutenant Krischke's desk, Calton repeated that he "was going to kill [him]self" and that he "needed help."

According to TDCJ policy (AD-06.56) and the procedures for handling offenders identified as suicide risks, "[i]f unit staff observe an offender expressing suicidal thoughts or thoughts of self-injurious behavior or exhibiting behaviors suggestive of suicidal intent, such as attempting to hang or cut one's self, staff shall bring the offender to medical personnel for evaluation."[23]  The determination whether an offender is actually "at risk for suicide or self-injury," however, must be made by unit medical personnel.[24]

After speaking briefly with Calton, Lieutenant Krischke determined that he needed "mental health intervention" or evaluation and called another ranking correctional officer to escort Calton to the infirmary for psychiatric care.[25]  By Calton's own estimation, Sergeant Beverly Cannalito "quickly" responded and promptly took him to the infirmary, where the

---

[22]     Calton Dep. at 83-84.

[23]     Doc. # 75, TDCJ Administrative Directive 06.56 [AD-06.56] (Rev. 5).

[24]     *Id.*

[25]     Deposition of Karl Krischke [Krischke Dep.] at 24-25.

psychiatric department is located.  Calton arrived at the infirmary at around 8:45 a.m., approximately 15 minutes after he first apprised the unidentified correctional officer of his suicidal thoughts.

A standing order that governs the infirmary security detail (TDCJ Post Order 07.22) requires that the infirmary officer "pat-search[]" all offenders who enter and exit the infirmary.[26]  It is undisputed that neither Sergeant Cannalito, nor Officer Carolyn O'Bryant, who was assigned to provide security in the infirmary on September 19, 2008, searched Calton before he entered the infirmary.  Instead, Sergeant Cannalito immediately escorted Calton to Samuel Hallman's office.[27]  Because Hallman was available to see Calton right away, Sergeant Cannalito left Calton with Hallman and returned to duty elsewhere.[28]  Calton told Hallman, who is a psychologist employed by UTMB as a "Mental Health Manager," that he was very depressed, that he wanted to die, and that he was suicidal.[29]

The policy outlined in TDCJ AD-06.56 requires that offenders who are "at risk for suicide or self-injury must be transferred immediately to an inpatient psychiatric or crisis management facility or placed in outpatient mental health observation cells" in accordance

---

[26]     Doc. # 75, Exhibit I.

[27]     *Id.* at 94-95.

[28]     Deposition of Beverly Cannalito [Cannalito Dep.] at 26, 37.

[29]     Calton Dep. at 96-97.

with a separate TDCJ Health Services policy on suicide prevention.[30]  As a transfer facility, the Byrd Unit did not have an outpatient mental health observation cell in which to place Calton.[31]  The procedures found in AD-06.56 dictate that facilities that are not approved to use outpatient mental health observation cells, such as the Byrd Unit, "shall transfer offenders determined to be at imminent risk for suicide or serious self-injury immediately to an inpatient psychiatric or crisis management facility."[32]  Those procedures also dictate that offenders who are awaiting transfer "must remain under constant observation by security or medical personnel until the offender departs the unit."[33]

In addition to the policy found in TDCJ AD-06.56, medical personnel also have a "Suicide Prevention Plan" in place (TDCJ Health Services Policy G-53.1) to treat offenders who are identified as being at-risk of self-harm. The Suicide Prevention Plan found in Policy G-53.1 contains similar instructions for Health Services staff.[34]

Hallman, who has worked for TDCJ for over 20 years both as a prison guard and a psychologist, performed an assessment on Calton as soon as Sergeant Cannalito brought

---

[30]     Doc. # 75, Exhibit H, TDCJ Administrative Directive 06.56 [AD-06.56] (Rev. 5).

[31]     AD-06.56.  The policy acknowledges that only certain units are "approved to utilize mental health observation cells in accordance with the TDCJ Health Services policy G-53.1, Suicide Prevention Plan."

[32]     AD-06.56.

[33]     *Id.*

[34]     Doc. # 73, Exhibit G.  The UTMB Mental Health Service Department also has procedures that govern the identification and treatment of offenders at risk for suicide or self-injury [Doc. # 73, Ex. H].

Calton to Hallman's office.[35]  During that evaluation, Calton told Hallman that "he [could] not get the thought of cutting his wrists out of his mind" and that he was deeply depressed.[36] When Hallman asked if Calton had cut himself before, Calton disclosed that he had cut his wrist previously in 2005.[37]  When Hallman asked Calton if he was planning to "cut himself," Calton did not respond.[38]  Hallman then directly asked Calton whether he had a razor on his person, in his mouth, or in his "house" (*i.e.*, his cell).[39]  Calton answered "no."[40]

Hallman told Calton to take a seat outside his office in the infirmary waiting room, where an estimated 50 to 60 other inmates were in line for medical appointments.  After Calton left Hallman's office, Hallman called one of TDCJ's in-patient mental health facilities (the Skyview Unit) to make arrangements for Calton to be evaluated further.[41]  Hallman then called Nurse Beverly Love to his office and told her that Calton "needed to be worked up for crisis management."[42]

While arrangements were being made for his transfer to the Skyview Unit, which is

---

[35]     Deposition of Samuel Hallman [Hallman Dep.] at 35-36, 67.

[36]     *Id.* at 73.

[37]     *Id.* at 72-73.

[38]     *Id.*

[39]     *Id.*

[40]     *Id.*

[41]     Hallman Dep. at 79.

[42]     Doc. # 73, Ex. A, at 4; Deposition of Beverly Love at 21; Deposition of Samuel Hallman at 151.

located in Gatesville, Texas, Calton was instructed to remain in the infirmary waiting area.[43]
Officer O'Bryant was informed that Calton "was not to leave the clinic" because he was
going to be transferred to the Skyview Unit for crisis management.[44]  According to Officer
O'Bryant, Hallman advised her that Calton "was going to his cell and cut himself or create
a disturbance in the [infirmary]."[45]

Calton, who claims that he was unaware of the plan to transfer him for crisis
management, did not wait patiently.  At about 9:15 a.m., Calton approached Nurse Love and
told her that he needed help immediately because he was suicidal.  Nurse Love, who was
helping Hallman to make the requisite transfer arrangements, told Calton to return to his seat.
Calton claims that he then turned to Officer O'Bryant and told her that he was suicidal.
Officer O'Bryant also reportedly told Calton to return to his seat.  While Calton continued
to wait, he saw Tolles enter Hallman's office.  Calton approached both men and repeated that
he was suicidal and needed help.  Calton claims that Tolles "yelled" at him to "sit down and
wait," because he (Calton) "wasn't going to kill [himself] right then."

Unbeknownst to any of the defendants up to this point, Calton had in his possession
the plastic safety razor he had been issued the previous day along with the bedroll that he had
been given during the intake process.  Calton had placed the safety razor in a small plastic
"ID holder" or pouch that was clipped to the front of his uniform.  Uncertain whether the

---

[43]     Doc. # 52, at ¶ 27.

[44]     Deposition of Carolyn O'Bryant [O'Bryant Dep.] at 37, 47.

[45]     Doc. # 78, Exhibit E, at 7.

razor was visible, Calton explains that he "may have" placed the safety razor behind some other items in the pouch, which also contained the prison identification card that was required to be on his person at all times and a medication pass.  Sometime before 10:00 a.m., Calton slipped into the infirmary restroom with the safety razor in his possession.  Calton estimates that he sat in the restroom for 15 minutes before he took the safety razor out of his ID pouch, broke the metal blade out of its plastic case, and used it to cut his wrists.

It is undisputed that Officer O'Bryant, who was the only security officer assigned to the infirmary on the morning of September 19, 2008, failed to keep Calton under direct observation while he was in the restroom. Officer O'Bryant explains that she left the infirmary briefly to get something to drink from the commissary.[46] Officer O'Bryant advised the officer who came to relieve her (Officer Ortiz, who is not a defendant in this case) that Calton "was not to leave the clinic because he was being transported to Skyview."  When Officer O'Bryant returned a few minutes later, Officer Ortiz told her that Calton was in the restroom.  Officer O'Bryant looked in through a small window on the bathroom door and observed Calton "near the toilet" with his back towards her.  It appeared to Officer O'Bryant that Calton was "using the restroom."  By Officer O'Bryant's estimation, "[a]nother minute or two passed" before Calton "opened the door to the restroom and [she] could see that his wrists were bleeding."   At that time, she alerted other security officers that there was a "cutter in the infirmary."

---

[46]        Doc. # 79, Exhibit F.

Sergeant Cannalito was the first officer to respond to the infirmary, along with other security officers.  When these officers arrived, Calton stepped out of the restroom and dropped the razor blade.  Calton was promptly escorted into the infirmary emergency room. The medical records show that Calton inflicted a 2-inch cut to his left wrist, which required 4 sutures.[47]  Calton's right wrist sustained a 1-inch cut that required 2 sutures, a ½-inch cut that required 1 suture, and a small-sized superficial cut that required only a bandage.[48]  After his injuries were treated, Calton was promptly transported to the Skyview Unit on September 19, 2008.

### D.    Calton's Allegations

In his pending civil rights complaint, Calton claims that the defendants are "responsible for the pain and mental anguish caused by their impermissible and unconstitutional failure to prevent his suicide attempt[.]" In particular, Calton claims that the defendants failed to provide him with adequate medical care or to prevent him from attempting suicide after he told each of them that he wanted to kill himself.[49]  Citing the defendants' failure to prevent him from attempting suicide, Calton seeks compensatory and punitive damages from the defendants in their official and individual capacities.  He also seeks an injunction requiring the defendants to "implement a policy for managing suicidal inmates and preventing those inmates from inflicting self-harm and requiring [d]efendants

---

[47]    Doc. # 73, Ex. A, at 6.

[48]    *Id.*

[49]    Doc. # 52, Amended Complaint, ¶ 36.

to adequately train and supervise TDCJ officers and UTMB medical personnel to carry out the policy and take appropriate actions to manage suicidal inmates and prevent those inmates from inflicting self-harm."[50]

The health care providers (Hallman, Love, and Tolles) have filed a joint motion for summary judgment, arguing that the Eleventh Amendment bars Calton's claims against them in their official capacity and that they are entitled to qualified immunity from Calton's claims against them in their individual capacity [Doc. # 72].  The security officers (Lieutenant Krischke, Sergeant Cannalito, and Officer O'Bryant) have also filed a joint motion for summary judgment on those same grounds [Doc. # 74].  The parties' contentions are addressed below under the governing standard of review.

## II.    STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under this rule, a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 248 (1986).  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for

---

[50]      *Id.* at ¶ 49.

the nonmoving party. *Id*.

If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-movant to provide specific facts showing the existence of a genuine issue for trial. *See Matsushita*, 475 U.S. at 587. In deciding a summary judgment motion, the reviewing court must "construe all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotation marks omitted). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## III.   DISCUSSION

Calton filed the complaint in this case under the civil rights statute found at 42 U.S.C. § 1983, which provides a private right of action to individuals who are deprived of "any rights, privileges, or immunities" protected by the Constitution or federal law by any person acting under the color of state law. To establish liability under § 1983, a civil rights plaintiff must satisfy two elements: (1) state action, *i.e.*, that the conduct complained of was committed under color of state law, and (2) a resulting violation of federal law, *i.e.,* that the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *Baker v. McCollan*, 443 U.S. 137, 142 (1979).

As outlined above, Calton primarily claims that the defendants were deliberately indifferent to his health and safety, in violation of the Eighth Amendment to the United States Constitution, by failing to prevent him from attempting suicide on September 19, 2008. The defendants contend that they are entitled to qualified immunity from Calton's claims against them in their individual or personal capacity, and that the Eleventh Amendment bars the remainder of Calton's claims against them in their official capacity. These arguments are addressed in turn.

### A.    Qualified Immunity from Individual-Capacity Claims

The defendants argue that Calton fails to demonstrate that he was denied adequate care or that his pleas for help were deliberately ignored. The defendants also argue that, to the extent that Calton alleges a failure to train or supervise officers who might have prevented him from harming himself, such claims also fail as a matter of law. In the alternative, the defendants maintain that Calton fails to show that a constitutional violation occurred or that their response was objectively unreasonable under the circumstances. The defendants maintain, therefore, that they are entitled to qualified immunity from liability for Calton's claims against them in their individual or personal capacity.

Public officials acting within the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects government employees against civil liability in their individual capacity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Harlow*, 458 U.S. at 818)) (internal quotation marks omitted).  "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable."  *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)). Thus, the doctrine of qualified immunity "shields from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'"  *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

To determine whether a public official is entitled to qualified immunity for an alleged constitutional violation, reviewing courts engage in a two-prong inquiry.  *See Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009).  The first prong of the analysis asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right that was "clearly established" at that time.  *See id.*, 129 S. Ct. at 815-16;  *Scott v. Harris*, 550 U.S. 372, 377 (2007) (citation omitted).  The second prong of the analysis asks whether qualified immunity is appropriate, notwithstanding an alleged violation, because the defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.*, 543 F.3d 221, 225 (5th Cir. 2008) (quoting *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007)).  A reviewing court may consider these prongs in any sequence.  *See Pearson*, 129 S. Ct. at 818.

The usual summary judgment burden of proof is altered in the case of a qualified

19

immunity defense.  *See Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).  An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law.  *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct.  *See Michalik*, 422 F.3d at 262; *see also Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (noting that, to avoid summary judgment on qualified immunity, a plaintiff need not present "absolute proof," but must offer more than "mere allegations") (quotation omitted).  In this case, the Court finds it appropriate to examine initially whether the plaintiff establishes a constitutional violation of the Eighth Amendment to the United States Constitution, which governs access to medical or mental health care and prohibits deliberate indifference to serious health and safety needs.

### 1.     Eighth Amendment — Medical Care

Calton alleges that the defendants violated his constitutional rights under the Eighth Amendment by denying him adequate medical or mental health care at the Byrd Unit and that he injured himself as a result of their failure to protect him from self-harm.  "Although the Eighth Amendment 'does not, by its precise words, mandate a certain level of medical care for prisoners[,]' the Supreme Court has interpreted it as imposing a duty on prison officials

to 'ensure that inmates receive adequate . . . medical care.'" *Easter v. Powell*, 467 F.3d 459,

463 (5th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).   "A prison

official violates the Eighth Amendment's prohibition against cruel and unusual punishment

when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs,

constituting an 'unnecessary and wanton infliction of pain.'" *Easter*, 467 F.3d at 463 (citing

*Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)).

It is also settled that prison officials have a constitutional duty to protect a prisoner with

known or obvious suicidal tendencies from self-inflicted harm.   *See Jacobs v. West Feliciana*

*Sheriff's Dept.*, 228 F.3d 388, 394 (5th Cir. 2000); *see also Flores v. County of Hardeman*,

124 F.3d 736, 738 (5th Cir. 1997) ("A detainee's right to adequate protection from known

suicidal tendencies was clearly established when Flores committed suicide in January

1990.").

 The defendants maintain that Calton cannot establish a valid Eighth Amendment claim

because he fails to show that they acted with the requisite deliberate indifference to a serious

medical need or threat to his safety.   The Eighth Amendment deliberate-indifference standard

has both an objective and subjective component.   *See Farmer v. Brennan*, 511 U.S. 825, 834

(1994).  To establish deliberate indifference under this standard, the prisoner must show that

(1) the defendants were aware of facts from which an inference of an excessive risk to the

prisoner's health or safety could be drawn, and (2) that they actually drew an inference that

such potential for harm existed.   *See id.* at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th

Cir. 1999).   The Fifth Circuit has stated that the deliberate-indifference standard is an

"extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "A prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847). Where medical care is concerned, "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Id.* (citations omitted). A showing of deliberate indifference requires the prisoner to submit evidence that prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (citations omitted).

The chronology that forms the basis of Calton's complaint in this case, which is outlined in more detail above, refutes Calton's claim that he was denied prompt medical intervention or mental health care in violation of the governing constitutional standards. In that respect, Calton does not dispute that he denied being suicidal when directly asked during his screening interview with the intake nurse on September 18, 2008. Calton also does not dispute that he expressly denied being suicidal or harboring thoughts of self-harm during his hour-long interview with a mental health clinician (Tolles) that same day. Calton concedes that, when he first announced his suicidal intention to the unidentified correctional officer who was conducting the count of his housing unit on the morning of September 19, 2008, the

officer immediately removed Calton from his cell and took him to a supervisor (Lieutenant Krischke), who promptly contacted another ranking security official (Sergeant Cannalito) to escort Calton to the infirmary for a mental health evaluation.

It is undisputed that Calton was examined by a psychologist (Hallman) within 15 minutes of alerting officers to his suicidal state. Hallman testified in his deposition that, when advised of a prior suicide attempt in 2005, he expressly asked Calton if he had any intention of cutting himself and he also asked Calton directly if he had a razor on his person.[51] Calton denied that he did.[52] In fact, Calton admitted during his deposition that he did not tell anybody that he planned to cut himself:

> No, I didn't tell anybody about cutting myself. I told them I wanted to kill myself, I wanted to die, I needed help. That's when I told them I was suicidal. I never said anything about how I was going to do it. I never told anybody about cutting myself.[53]

After concluding that Calton warranted further evaluation, Hallman and Nurse Love promptly began to make arrangements to transfer Calton to an inpatient facility (the Skyview Unit) for crisis management. In the meantime, Calton was seated outside Hallman's office in the waiting room, where a security officer (Officer O'Bryant) was present. A review of Calton's testimony, which shows that he approached Nurse Love, Officer O'Bryant, Hallman and Tolles, shows that he was within full view of others while he remained in the waiting

---

[51]     Hallman Dep. at 73-74.

[52]     *Id.*

[53]     Calton Dep. at 93-94, 96-97.

room.

As Calton concedes, both TDCJ and the Health Services Division have policies in place to prevent suicide by incarcerated offenders (TDCJ Policy AD-06.56 and Health Services Policy G-53.1).  The record, which shows that the defendants acted promptly to escort Calton for evaluation by a medical professional (Hallman) and for mental health crisis management, refutes Calton's central allegation that the defendants "failed to impose any suicide prevention measures[.]"[54] Likewise, Calton does not show that the policies were deficient or that he was otherwise denied adequate care in violation of the applicable constitutional standard.  As the Fifth Circuit has recognized, "[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting." *Domino*, 239 F.3d at 756 (citing *Collignon v. Milwaukee Co.*, 163 F.3d 982, 990 (7th Cir. 1998)).  Taking all of the facts in the light most favorable to Calton, as non-movant, Calton fails to demonstrate that any of the defendants deliberately ignored his complaints, refused him treatment, or intentionally treated him incorrectly.

Calton appears to allege that, if only Tolles had immediately given him Wellbutrin on September 18, 2009, instead of the Celexa that had been previously prescribed, he would not have attempted to harm himself.  To the extent that Calton disagrees with the level of care that he received, the Fifth Circuit has held repeatedly that mere disagreement with medical treatment does not state a claim for deliberate indifference to serious medical needs under

---

[54]     Doc. # 52, Amended Complaint, ¶ 37.

the Eighth Amendment. *See Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985); *Young v. Gray*, 560 F.2d 201, 201 (5th Cir. 1977).  Even assuming that a lapse in professional judgment occurred, any such failure amounts to mere negligence or malpractice, and not deliberate indifference. *See Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir. 1999) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).  Thus, allegations of negligence and medical malpractice will not suffice to demonstrate a constitutional violation. *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001); *see also Stewart*, 174 F.3d at 534 ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not.").  Based on this record, Calton does not show that Tolles or any other individual defendant was deliberately indifferent to his mental health or that a constitutional violation occurred with respect to his medical care.

Calton insists, nevertheless, that the measures taken by the defendants were inadequate because, after advising them that he was suicidal, they "failed to restrain Calton, pat search him for objects with which he might harm himself, and/or visually monitor and supervise him."[55]  Calton notes in particular that Officer O'Bryant, who was assigned to provide security for the infirmary on September 19, 2008, did not pat search him when he entered the medical department as required by the standing order governing that work

---

[55]      Doc. # 52, Amended Complaint, ¶ 37.

25

assignment (TDCJ Post Order 07.22). Calton complains further that, once it was determined by Hallman that he needed crisis management, Officer O'Bryant should have searched him at that time. Calton also complains that, contrary to the suicide prevention policies in place [TDCJ AD-06.56 and Health Services Policy G-53.1], Officer O'Bryant failed to keep him under constant supervision while he waited to be transferred to the Skyview Unit. In other words, Calton claims that the defendants should have done more to prevent him from harming himself.

It is undisputed that TDCJ AD-06.56 requires "constant observation" for inmates who are awaiting transfer for crisis management and that Officer O'Bryant did not ensure that Calton was directly supervised while he was in the restroom. Officer O'Bryant also admits that she did not search Calton when he entered the infirmary and that she did not comply with the post order (TDCJ Post Order 07.22) for her job assignment. She apparently assumed that, because Calton was being escorted by Sergeant Cannalito, who was a ranking security official, Calton had already been searched. Sergeant Cannalito acknowledged in her deposition that, as infirmary officer, it was O'Bryant's duty to pat-search any offender who enters or exits the infirmary, regardless of whether the inmate was escorted by another security officer.[56] Therefore, it was "incorrect" for her to assume that Calton had been subject to a pat-search.[57]

Warden Bailey also acknowledges that TDCJ Post Order 07.22 "requires the infirmary

---

[56]     Cannalito Dep. at 25.

[57]     *Id.*

officer to pat-search offenders when they enter and leave the infirmary," but that this was not done in Calton's case.[58]  Nevertheless, Warden Bailey states that she is "quite familiar with how pat-searches are conducted and it is [her] opinion that even if Calton was pat-searched, a standard issue razor could still have gone undetected" because "that type [of] razor is small and can be successfully secreted about the offender's person to escape detection during a pat-search."[59]  The defendants argue, therefore, that a pat-search would not necessarily have kept Calton from harming himself after he entered the infirmary on September 19, 2008.

To the extent that Calton claims that the defendants violated prison policy, it is well established that an officer's failure to follow prison rules, standing alone, does not warrant relief under 42 U.S.C. § 1983.  *See Stanley v. Foster*, 464 F.3d 565, 569 (5th Cir. 2006) (citing *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996)); *Murray v. Mississippi Dep't of Corrections*, 911 F.2d 1167, 1168 (5th Cir. 1990); *Hernandez v. Estelle*, 864 F.2d 1235, 1251-52 (5th Cir. 1989); *see also Jackson v. Cain*, 864 F.2d 1235, 1251-52 (5th Cir. 1989) (noting that a state's failure to follow its own rules or regulations, alone, does not establish a constitutional violation).  To prevail, a civil rights plaintiff must demonstrate a constitutional violation.

An unsuccessful failure to prevent harm is not actionable under the Eighth Amendment if reasonable steps have been taken to ensure safety in the turbulent prison environment.  *See Farmer*, 511 U.S. at 834 (citations omitted).  To establish liability for a

---

[58]     Doc. # 75, Exhibit B, Bailey Report, ¶ 6.

[59]     *Id.*

claim based on a failure to prevent harm, an inmate must show that he has been incarcerated under conditions which, objectively, posed a sufficiently serious risk of harm. *See id.* The Supreme Court has explained that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. Notably, "prison officials who actually knew of a substantial risk of inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. A prison official's duty under the Eighth Amendment is to ensure "'reasonable safety'" under the circumstances. *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). The Eighth Amendment standard associated with this duty incorporates due regard for the "unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* at 846 (citations omitted). Thus, the Supreme Court has emphasized that "a prison official may be held liable under the Eighth Amendment . . . only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

Calton's contention that the defendants' response was inadequate or unreasonable under the circumstances does not establish a claim for deliberate indifference in violation of the Eighth Amendment. The record does not demonstrate that the defendants had reason to know that Calton had a razor blade in his possession and intended to cut himself with it. It bears repeating that Calton denied he had a razor blade on his person and he did not tell anyone he encountered on September 19, 2008, that he intended to cut himself

28

momentarily.[60] While the defendants clearly knew that Calton was depressed, if not suicidal, and that he needed mental health evaluation, this is not enough to establish deliberate indifference under the facts presented.  A defendant cannot be found liable under the "deliberate indifference" standard unless that defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  In the context of failing to prevent a prisoner's suicide, "[the deliberate-indifference] standard is met only if there [was] a 'strong likelihood, rather than a mere possibility,' that self-infliction of harm would result." *Lambert v. City of Dumas*, 187 F.3d 931, 937 (8th Cir. 1999) (citation and quotation omitted); *see also Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1539-40 (11th Cir. 1994) (explaining in the context of a jail suicide case that "deliberate indifference can only be established where a plaintiff demonstrates a 'strong likelihood, rather than a mere possibility,' that suicide would result from a defendant's actions or inaction").  The strong likelihood must be based on facts concerning the inmate at issue, "not experience with other [inmates] in the facility or studies of [inmates] generally.  *Bowen v. City of Atmore*, 171 F. Supp. 2d 1244, 1253 (S.D. Ala. 2001) (citing *Tittle*, 10 F.3d at 1539) ("[A] finding of deliberate indifference requires that officials have notice of the suicidal tendency of *the* individual whose rights are at issue . . .") (emphasis in original).

The record demonstrates that none of the correctional officers at the Byrd Unit knew of Calton's history of mental health problems because, due to privacy laws, medical

---

[60]     Calton Dep. at 79, 84-85, 91, 93-94, 96-97, 105-06, 114.

personnel are prohibited from sharing this information.  In TDCJ, medical information is not available to correctional officers below the rank of Captain.[61]  Although there is evidence showing that both Tolles and Hallman knew that Calton had made a previous suicide attempt three years earlier in 2005, a suicide attempt that is remote in time is insufficient to show a strong likelihood that suicide will result.  *See Lambert*, 187 F.3d at 938 (holding that a suicide attempt was insufficient to show a strong likelihood of suicide three years later); *see also Bowen*, 171 F. Supp. 2d at 1255-56 (refusing to infer a strong likelihood of suicide based on an inmate's remote history of previous attempts).

The record does not otherwise demonstrate an obvious or strong risk of suicide here. Even assuming that the defendants failed to search, restrain, or otherwise continuously monitor Calton while he awaited his transfer to the Skyview Unit, the record establishes that he was seated outside Hallman's office where Hallman and Nurse Love were preparing his transfer.  Although Calton claims that he did not know he was being transferred to an inpatient facility for further monitoring, it is obvious that his complaints were not being ignored.  In that regard, the record reflects that Calton was escorted to the infirmary in a prompt manner and, after conducting a brief evaluation, Hallman told Nurse Love and Officer O'Bryant that Calton could not leave the infirmary because he was being transferred for crisis management.

---

[61]    Deposition of Jamie Williams, at 20; *see also* Hallman Dep. at 151 (explaining that officers are not told about an inmate's mental, medical, or dental conditions because it would violate the HIPAA privacy rule).

To the extent that Calton complains that he was not searched or restrained and that was able to go to the restroom unsupervised, the deficiencies that he references constitution negligence, at worst, and do not rise to the level of deliberate indifference.  As the Fifth Circuit has recognized, officials are not required to "unerringly detect suicidal tendencies" in prisoners.  *Evans v. City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993); *see also Domino*, 239 F.3d at 756 (noting that suicide is inherently difficult for anyone to predict, particularly in the depressing prison setting).  It is well established that deliberate indifference "is a degree of culpability beyond mere negligence or gross negligence; it 'must amount to an intentional choice, not merely an unintentional oversight.'" *James v. Harris County*, 577 F.3d 612, 617-18 (5th Cir. 2009) (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992); *see also Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000)).  Only deliberate indifference will suffice to state a claim under the Eighth Amendment; mere negligence is not sufficient.  *See id.*; *see also Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990) (holding that a negligent failure to protect from harm does not make a claim under 42 U.S.C. § 1983).  Thus, even if the defendants were negligent in failing to assess or monitor Calton properly, this is insufficient to demonstrate liability under the Eighth Amendment standard.  *See Domino*, 239 F.3d at 756; *see also Whitt v. Stephens County*, 226 F. App'x 900, 902, 2007 WL 1577930, *2 (5th Cir. 2007).

There is no evidence that any of the individual defendants deliberately disregarded a known danger to Calton's health or safety as he sat in the infirmary waiting room on September 19, 2008.  Based on this record, Calton does not demonstrate that he was

intentionally treated with wanton disregard for his mental state or that any of the defendants were deliberately indifferent to a known risk of harm.  Thus, Calton fails to demonstrate the requisite knowledge on the defendants' part of a substantial risk to Calton's health or safety. Because Calton has failed to raise a genuine issue of material fact on whether he was denied adequate care or safekeeping, he does not establish a constitutional violation and the defendants are entitled to summary judgment on the defense of qualified immunity in connection with this claim.

### 2.        Failure to Train and/or Supervise

Calton alleges that Lieutenant Kritsche and Sergeant Cannalito violated his Eighth Amendment rights by failing to train or supervise staff to prevent suicide attempts.[62] "Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) (quoting *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)). To establish § 1983 liability against supervisors, the plaintiff must show that: (1) the supervisory official failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th

---

[62]        Doc. # 52, Amended Complaint, at ¶¶ 45-47.

Cir. 2003).

Calton's claim concerns the failure of Officer O'Bryant to comply with TDCJ Post Order 07.22 by subjecting Calton to a pat-search when he entered the infirmary. As outlined above, all of the individual defendants identified by Calton complied with existing prison policies designed to prevent suicide and did not consciously disregard a strong likelihood that Calton would attempt suicide while he waited in the infirmary to be transferred to the Skyview Unit. The record does not reflect that a failure to train or supervise amounted to deliberate indifference, as opposed to negligence. In that respect, where claims of inadequate training or supervision are at issue, "mere proof that the injury could have been prevented if [an] officer had received better or additional training cannot, without more, support liability." *Roberts v. City of Shreveport*, 397 F.3d.287, 293 (5th Cir. 2005) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (quoting *City of Canton*, 489 U.S. at 390-91)).

Based on this record, Calton fails to raise a genuine issue of material fact on whether Lieutenant Krischke or Sergeant Cannalito violated his Eighth Amendment rights by failing to train and/or supervise security officers at the Byrd Unit. Accordingly, these defendants are entitled to summary judgment on the defense of qualified immunity.

### 3.      Objective Reasonableness

Alternatively, even assuming that a constitutional violation occurred, the defendants insist that they are entitled to qualified immunity nevertheless because they acted in good faith and Calton cannot show that their actions were objectively unreasonable under the circumstances. Thus, the Court turns to the second prong of the qualified immunity

33

framework and examines whether the defendants' conduct was objectively unreasonable. To avoid summary judgment on the second prong of the qualified immunity defense, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law *and facts available to them*." *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993) (emphasis added). If reasonable public officials could differ as to whether the defendants' actions were lawful, the defendants are entitled to immunity. *See Malley*, 475 U.S. at 341.

As outlined above, the chronology reflects that Calton was quickly escorted to the infirmary for a mental health evaluation on the morning of September 19, 2008. He was immediately evaluated by Hallman, who determined that Calton needed crisis management and began making arrangements to transport him to an appropriate inpatient facility. Calton does not take issue with the promptness in which he was treated or the reasonableness of the defendants' efforts to afford him immediate medical care. The Court concludes that the actions taken by the health care providers (Hallman, Tolles, and Love) were not objectively unreasonable.[63]

Calton complains, however, that it was objectively unreasonable that the defendants failed to search him, place him in restraints, and subject him to constant observation at all times while he waited to be transferred to the Skyview Unit. According to TDCJ Post Order

---

[63]   The record reflects that medical personnel are not allowed to search inmates. Hallman Dep. at 77.

07.22, which governs duties assigned to the infirmary officer, Officer O'Bryant was supposed to pat search every offender who entered the infirmary for treatment. Officer O'Bryant, who knew that Calton was awaiting transfer to an in-patient psychiatric facility for crisis management, admits that she did not conduct a pat search.[64]  Warden Bailey notes that, even if a pat-search had been done, it may not have disclosed a razor hidden on a prisoner's person.  In view of the fact that Calton denied having a razor in his possession, it was not clearly unreasonable for health care providers to have him wait in the infirmary, where a security officer was present, and other medical personnel were nearby, while Calton waited to be transferred to the Skyview Unit.

Calton argues, nevertheless, that the measures taken in his case were not sufficient to protect him from self-harm.  The Fifth Circuit has observed that the law is clearly established that prison officials and jailers "must take measures to prevent inmate suicides once they know of the suicide risk." *Hare v. City of Corinth*, 135 F.3d 320, 328-29 (5th Cir. 1998) (quoting *Rellergert v. Cape Girardeau County*, 924 F.2d 794, 797 (8th Cir. 1991)).  However, the "objective reasonableness standard does not afford a simple bright-line test" in this context, *Hare*, 135 F.3d at 328, and Calton does not cite any authority, much less show that the law is established with any clarity, about what those measures must be.  The facts are insufficient to establish that the defendants' actions were objectively unreasonable here.  Importantly, the second prong of the qualified immunity analysis requires a reviewing

---

[64]     Because Calton was escorted to the infirmary by a ranking security office (Sergeant Cannalito), Officer O'Bryant evidently assumed that Calton had already been searched.

court "only to determine whether, in light of the facts viewed in the light most favorable to the plaintiff[], the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard." *Jacobs*, 228 F.3d at 394. Viewing all of the evidence in Calton's favor, the failure of security officers to ensure that he had been searched once he expressed suicidal impulses and to ensure that Calton was restrained or directly monitored at all times while he awaited his transfer to crisis management rises only to the level of negligence. To establish liability under 42 U.S.C. § 1983, a plaintiff must demonstrate more than "mere negligence or even gross negligence." *Rhyne*, 973 F.2d at 392 (explaining that the basis of § 1983 liability "must amount to an intentional choice, not merely and unintentionally negligent oversight"). The defendants' actions, while less than ideal, do not demonstrate conscious disregard of a known risk of imminent harm to Calton's health or safety and are not sufficient to satisfy the deliberate indifference standard under the facts of this case.

In summary, Calton, as plaintiff, has the burden to produce admissible evidence that raises a genuine issue of material fact on whether the defendants' actions were objectively unreasonable under the circumstances in view of existing law and the facts known to them. *See Michalik*, 422 F.3d at 262. Calton has filed lengthy responses to the defendants' motions for summary judgment, but he does not overcome the defendants' assertion of qualified immunity. Calton does not present evidence showing that the defendants knew, but deliberately chose to disregard, facts showing that Calton harbored a razor blade on his person and posed an immediate danger to himself while he was seated in the infirmary.

36

Calton has not otherwise shown that the defendants acted with the requisite deliberate indifference to his health or safety.  Likewise, he does not show that the actions taken by the defendants were objectively unreasonable in this instance.  The Court concludes, therefore, that summary judgment on the defendants' assertion of qualified immunity is warranted.

### B.       Eleventh Amendment Immunity — Official Capacity Claims

The defendants argue that Calton's claims against them in their official capacity as state employees are barred by the Eleventh Amendment to the United States Constitution.[65] Federal court jurisdiction is limited by the Eleventh Amendment and the principle of sovereign immunity that it embodies.  *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Vogt v. Board of Comm'rs, Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002).  Unless expressly waived, the Eleventh Amendment bars an action in federal court by, *inter alia*, a citizen of a state against his or her own state, including a state agency.  *See Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 574 (5th Cir. 2002).

As state agencies, TDCJ and UTMB are immune from a suit for money damages under the Eleventh Amendment.  *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).  It is also settled that the Eleventh Amendment bars a recovery of money damages under 42 U.S.C. § 1983 from state employees in their official capacity.  *See Oliver v. Scott*, 276 F.3d

---

[65]       The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.

736, 742 (5th Cir. 2001); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998).  Because all of the defendants are state employees of TDCJ or UTMB, the Eleventh Amendment bars Calton's claims for monetary damages against them in their official capacity.

A narrow exception to Eleventh Amendment immunity exists for suits brought against individuals in their official capacity, as agents of the state or a state entity, where the relief sought is injunctive in nature and prospective in effect.  *See Aguilar*, 160 F.3d at 1054 (citing *Ex parte Young*, 209 U.S. 123 (1980)).  Although Calton seeks injunctive relief in this case, the exception is narrow and allows only prospective relief.  The defendants maintain that Calton does not fit within the limited exception and that he cannot prevail in this instance.

According to the complaint, Calton faults the defendants for failing to institute a policy that "inmates expressing suicidal thoughts be denied the prison-issued shaving razor, be immediately restrained, be immediately searched for dangerous objects, and/or be visually monitored and supervised continuously."[66]  Calton claims further that certain defendants failed to adequately supervise or train staff to prevent suicide attempts and that he was harmed as a result.[67]  Thus, Calton requests injunctive relief in the form of a court order directing the defendants to adopt an adequate policy to prevent suicide attempts by inmates and to adequately train officers and supervise personnel to ensure that suicide prevention policies are enforced.

---

[66]    Doc. # 52, Amended Complaint, at ¶ 42.

[67]    *Id.* at ¶¶ 45-47.

The defendants note that TDCJ and its Health Services Division already have policies in place that are designed to prevent suicide.[68]  Likewise, according to the statement from Warden Tracy Bailey, once an inmate is identified as suicidal, he is not issued a safety razor, but is instead given a clipper shave device that is not capable of causing harm.[69]  Thus, contrary to Calton's allegation, there is a policy in place that pertains to preventing suicide as well as access to a state-issued razor by prisoners who express suicidal intentions.

Calton does not dispute that there are suicide prevention policies in place at TDCJ and that access to razors is restricted in certain circumstances.  Calton insists, however, that the policies and practices in place are inadequate where he has been concerned.  Calton discloses that, in addition to his suicide attempt that occurred on September 19, 2008, he used a state-issued razor to cut his wrists again while this lawsuit was pending in December of 2010.[70]  The defendants argue, nevertheless, that Calton does not show that he has standing to request injunctive relief that is prospective in nature or that such relief is available in this case.  In order to pursue a claim in federal court, a plaintiff must establish standing as part of the "case-or-controversy requirement" found in Article III of the United States Constitution, which restricts federal court jurisdiction.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (emphasizing the critical role of standing, which is a "core component" of the "case-or-controversy requirement" found in Article III) (citing *Lujan v. Defenders of*

---

[68]      Doc. # 73, Exhibits G & H; Doc. # 75, Exhibit H.

[69]      Doc. # 75, Exhibit B, ¶ 5.

[70]      Doc. # 78, at 24; Doc. # 79, at 24.

*Wildlife*, 504 U.S. 555, 560 (1992)).  The "irreducible constitutional minimum of standing" requires the following three elements: (1) the plaintiff must have suffered an "injury in fact" – that is, an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent," not "conjectural" or "hypothetical"; (2) there must be causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it must be "likely" as opposed to merely "speculative" that the injury will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560-61.

The defendants note that none of them are in a position to adopt the policy that Calton seeks.  Because these defendants have no power to adopt the requested policy, Calton has not articulated a valid case or controversy that will permit an action for injunctive relief against these defendants in federal court.  *See Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001). In other words, the plaintiff fails to satisfy the "'redressability' requirement" of the case-or-controversy analysis.  *See id*. at 426-27; *see also Lujan*, 504 U.S. at 560-61 (outlining the three elements — injury, causation, and redressability — to establish standing).  Because Calton does not raise a genuine issue of material fact on this claim, the defendants' motions for summary judgment will be granted.

## IV.    CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1.    The motion for summary judgment filed by Samuel Hallman, Beverly Love,

40

Richard Tolles, and Jamie Williams [Doc. # 72] is **GRANTED**.

2.      The motion for summary judgment filed by Lieutenant Karl Krischke, Sergeant Beverly Cannalito, and Officer Carolyn O'Bryant [Doc. # 74] is **GRANTED**.

3.      The Court appointed local attorney Jason Newman of Baker & Botts, LLP, to assist Calton with articulating his claims against the appropriate defendants, and he has done a commendable job. That order appointing counsel [Doc. # 31] is now **TERMINATED**.

4.      This case is **DISMISSED** with prejudice.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas, on May 27, 2011.

Nancy F. Atlas
United States District Judge

41